**Thomas E. Higgins**
LAW OFFICES OF THOMAS E. HIGGINS
325 West Franklin Street
Tucson, Arizona 85701
(520) 624-8663
State Bar No: 04324
Attorney for Rodney Langford

# IN THE UNITED STATES DISTRICT COURT
# IN THE DISTRICT OF ARIZONA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** | Case No: CR 18-01307-TUC-RCC (JR) |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION IN LIMINE/MOTION TO SUPPRESS EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| **RODNEY NEBRASKA LANGFORD,** | |
| Defendant. | HON. RANER C. COLLINS |

COMES NOW, the Defendant, Rodney Nebraska Langford, by and through undersigned counsel, hereby submits the forgoing Motion in Limine/Motion to Suppress Evidence. This Motion is supported by the accompanying Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED, this 2nd day of October, 2019.

*/S/ Thomas E. Higgins*
THOMAS E. HIGGINS
Attorney for Rodney Langford

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION:

This motion challenges the government's unreasonable stop, seizure, and search of the vehicles driven by Rodney Langford and Cedric Taylor in on August 23, 2017, in Tucson, Arizona. This motion further seeks to suppress any evidence, statements, or testimony obtained in violation of the Fourth Amendment, pursuant to the exclusionary rule and the *"fruit of the poisonous tree"* doctrine.

Mr. Langford is charged with knowingly and intentionally conspiring to possess with intent to distribute 165.4 kilograms of marijuana, in violation of Title 21, United States Code, § 841(a)(1), § 841(b)(1)(B)(vii) and § 846. The government intends to introduce; 1) a statement made by Mr. Langford to agents, 2) evidence seized as a result of an illegal stop in Tucson, AZ, and 3) evidence obtained during the search of a shipment in Albuquerque, New Mexico.

The physical evidence seized and the statements were all the products of an unreasonable search and seizure, conducted without reasonable suspicion that Mr. Langford engaged in a violation of the law. Though obtained pursuant to a search warrant, the evidence found during the search of the shipment in New Mexico, is inadmissible. The documents used to connect the Defendant to the shipment in New Mexico would not have been found but for the unreasonable search and seizure in Tucson. As such it must be excluded as , as Fruit of the Poisonous Tree, not subject to any exception.

### A.   FACTS:

On August 16, 2017, Homeland Security Investigations (HSI) agents, Tucson Border Enforcement Security Taskforce (BEST), and, Arizona Department of Public Safety (DPS) received information from HSI Flagstaff regarding a suspicious freight originating in Decatur, Georgia, destined for Tucson, Arizona. The freight was shipped by a Rodney Turner in Decatur, Georgia, to a Rodney Turner in Tucson, AZ. On August 21, 2017, DPS Detective Hopkins, and HSI Special Agent Mark Valenzuela made contact with manager of the ABF shipping the center, Gilbert Dominguez. Dominguez gave the officers permission to inspect the freight. DPS narcotic dogs conducted a search of the freight but did not alert regarding any odor of narcotics. Officers noticed that spools of copper were previously used and labelled "damaged material." After the officers left ABF, Dominguez called Detective Hopkins

to informed him that someone called and said he would be picking up the freight the next day, August 22, 2017. Officers set up surveillance of the shipping center but nobody came by to pick up the freight.

The following day, Mr. Langford and Mr. Taylor arrived at ABF at 1030 AM in a U-Haul truck. They left shortly thereafter and went to a U-Haul storage facility. There, Mr. Langford exited the U-Haul and entered a black Chevrolets Impala. The two vehicles cars left the U-Haul storage facility and drove toward St Mary's and I-10. Detective Hopkins *"arranged to have the vehicles stopped."*[1] Mr. Langford stopped his vehicle at a gas station located down the street. Officers then approached both vehicles and conducted a search.

When officer Valenzuela search the spools located inside the U-Haul truck, he discovered two vacuum sealed bags of U.S. currency in the amount of $49,060.00. While searching the Impala, officers discovered an ABF lading bill for a shipment from Pico Rivera, CA to Decatur, GA. Officers later detained and interviewed both Taylor and Langford without proper Miranda Warnings. Both men denied knowledge of the currency and signed AZDPS Abandonment form on the currency. The two men were then released.

## II.  LAW/ARGUMENT:

### A. OFFICERS DID NOT HAVE REASONABLE SUSPICION TO STOP/SEARCH THE IMPALA OR THE U-HAUL TRUCK.

The exclusionary rule prevents the government from using evidence seized in violation of the United States Constitution. Mapp v. Ohio, 367 US 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). *"[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court."* Id. at 655. Courts are commanded to apply the exclusionary rule to suppress use of any evidence that was illegally obtained in violation of the Fourth Amendment. Id. at 643.

### 1) THE GOVERNMENT BEARS THE BURDEN OF PROVING THE STOP WAS SUPPORTED BY REASONABLE SUSPICION.

The Fourth Amendment protects individuals from *"unreasonable searches and seizures."* US. Const. amend IV. Temporary detention of individuals during the stop of an automobile, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment. See Delaware v. Prouse, 440

---

[1] See DHS REPORT, ABF Surveillance Operation and Seizure of $49,060.00 U.S. Currency, page 3.

US. 648, 653 (1979); <u>United States v. Martinez-Fuerte</u>, 428 US. 543, 556 (1976). Stopping an automobile and detaining its occupants constitutes a *"seizure"* within the meaning of the Fourth Amendment, *"even though the purpose of the stop is limited and the resulting detention quite brief."* <u>Id</u>. at 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). *"An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."* <u>Whren v. United States</u>, 517 US 806, 810 (1996).

In order to stop and detain an individual without a warrant, an officer must have reasonable suspicion that the person is engaged in illegal activity. <u>United States v. Colin</u>, 314 F.3d 439, 442 (9th Cir. 2002). Reasonable suspicion requires that the agent making the stop be *"aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion."* <u>United States v. Montcro-Cammgo</u>, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). See also <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981) (An officer may stop a vehicle to investigate if there is a reasonable and articulable suspicion that the vehicle is being driven contrary to traffic laws). *"The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."* <u>Whren,</u> 517 US at 810; citing <u>Prouse</u>, 440 U. S. 648, 659 (1979); <u>Pennsylvania v. Mimms</u>, 434 U. S. 106, 109 (1977) (per curiam). *"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."* <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000); citing <u>United States v. Sokolow</u>, 490 U. S. 1, 7 (1989). To must the requisite reasonable suspicion, *"the officer must be able to articulate more than an "inchoate and unparticularized suspicion or `hunch' " of criminal activity."* <u>Id</u>. citing <u>Terry</u>, supra, at 27."

    2) <u>REASONABLENESS OF THE SUSPICION MUST BE EVALUATED UPON THE TOTALITY OF THE CIRCUMSTANCES.</u>

The reasonableness of the suspicion must be evaluated upon the totality of the circumstances at the time of the stop. <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002), citing <u>Cortez</u>, 449 U. S. at 417-418. *"…we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.* <u>Id</u>. While reasonable suspicion requires less than probable cause it cannot be rooted in *"mere speculation or*

instinct on the part of the officer." State v. Ramos, 142 Idaho 628, 634, 130 P.3d 1166, 1172 (Ct. App. 2005), citing State v. Cerino, 141 Idaho 736, 738, 117 P.3d 876, 878 (Ct.App.2005). To justify the intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889, 905 (1968); Cerino, 141 Idaho at 738, 117 P.3d at 878.

An officer may draw reasonable inferences from the facts in his possession, and he may draw those inferences from his own experience and training. Arvizu, 534 U.S. at 274, citing Cortez 449 U.S. at 418; See also Ornelas v. United States, 517 U. S. 690, 699 (1996) (the reviewing court must give "due weight" to factual inferences drawn by resident  judges and local law enforcement officers). Nevertheless, an officer many not rely on "a mere hunch" to justify a stop. Terry, 392 U.S. at 27. (emphasis added).

   3)  <u>ABSENT REASONABLE SUSPICION, THE STOP IS INVALID, AND ANY EVIDENCE SEIZED IS INADMISSIBLE..</u>

Evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible. <u>United States v. Chavez-Valenzuela</u>, 268 F.3d. 719, 727 (9th Cir. 2001); <u>Florida v. Royer</u>, 460 U.S. 491, 507-508, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); <u>Wong Sun v. United States</u>, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); <u>United States v. Morales</u>, 972 F.2d 1007, 1010 (9th Cir.1992).

   4)  <u>IN THIS CASE, LAW ENFORCEMENT OFFICERS LACKED REASONABLE SUSPICION TO STOP THE U-HAUL.</u>

Agents did not have reasonable suspicion to stop the U-Haul. While law enforcement offers ostensibly refer to the stop of the U-Haul as a traffic stop throughout their reports, there is no evidence that the driver ever committed a traffic violation. In fact, the police reports indicate that, Detective Hopkins "arranged to have the vehicles stopped."[2]

Cedric Taylor was never cited for violating any traffic laws, nor is there record of him being given a warning. Moreover, the officers never actually refer to a violation of traffic laws. Instead they echo the phrase "traffic stop" without an iota of evidence that a traffic violation occurred. Evidently, the officers use the term "traffic stop" to a pretext to conceal the illegal nature of the stop and subsequent seizure.

---

[2] See DHS REPORT, ABF Surveillance Operation and Seizure of $49,060.00 U.S. Currency, page 3.

The mere fact that HSI had pegged the shipment as "suspicious" is not enough to permit seizure of the U-Haul. The government never cites any articulable facts which explain why the shipment was marked as suspicious. Moreover, with the permission of the manager of the shipping center. Officers inspected the freight, brought in narcotic dogs, and conducted a search of the freight. Their search did not return any evidence of criminality, other than the labels on the spools seemed "unprofessional." These facts do not rise to the level of reasonable suspicion. They do not warrant the subsequent stopping of the vehicle the next day while it is on a public motor way.

     5)  <u>AGENTS LACKED REASONABLE SUSPICION TO SEARCH THE IMPALA</u>.

Mr. Langford who was driving the Chevrolet Impala stopped his vehicle at a gas station located down the street from where the U-Haul was stopped. Officers then approached him and "asked" to search his vehicle. Reasonable suspicion is determined by examining the totality of the circumstances, and officers may draw on their experience and training to make inferences and deductions about the total information available to them. <u>United States v. Valdes—Vega</u>, 73 8' F.3d 1074, 107849 (9th Cir. 2013). However, reasonable suspicion "must be based on facts and not the *"mere subjective impressions of a particular officer."* <u>United States v. Jimenez-Medina</u>, 173 F.3d 752, 754 (9th Cir. 1999; (quoting <u>United States v. Hernandez–Alvarado,</u>, 891 F.2d 1414, 1416 (9th Cir.1989)).

Reasonable suspicion must be individual and particularized. Is not communicable as is contagious disease. The mere fact that a car pulls into a gas station after another car is pulled over, does not by itself create reasonable suspicion in the second car. Even when it is known that the drivers of the two vehicles were travelling together, reasonable suspicion that the driver of one vehicle has violated the traffic laws does not transfer to the warrant stopping the other vehicle. *"While facts are to be interpreted in light of an officer's experience, 'experience may not be used to give officers unbridled discretion in making a stop."* <u>United States v. Jimenez-Medina</u>, 173 F.3d 752, 754 (9th Cir. 1999). Reasonable suspicion cannot be based on inarticulable hunches or general suspicions, but rather must be particularized to the person stopped. <u>Ybarra v. Illinois</u>, 444 U.S. 85, 92-94 (1979).

**B. THE EVIDENCE RETRIEVED AS A RESULT OF THE ILLEGAL STOP IS IN ADMISSIBLE AS "FRUIT OF THE POISONOUS TREE."**

Under the "fruit of the poisonous tree" doctrine, any evidence obtained through the exploitation of an unlawful search must be suppressed. See <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963). As the Supreme Court held, "we need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. <u>Id</u>. at 488; see also <u>Brown v. Illinois</u>, 422 U.S. 590, 599 (1975). Rather, the question is *"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."* <u>Id</u>.

Because agents did not have reasonable suspicion to stop the U-Haul, the currency retrieved during the search of the vehicle is inadmissible as "fruit of the poisonous tree." Likewise, because agents did not have reasonable suspicion to stop the Impala driven by Mr. Langford, the lading bill they retrieved, which subsequently led them to the shipment in New Mexico is also inadmissible.

## C.  NONE OF THE EXCEPTIONS TO THE EXCLUSIONARY RULE APPLY TO REMOVE THE TAINT FOR THE ILLEGALLY OBTAINED EVIDENCE.

The exclusionary rule does not apply when the connection between the illegal police conduct and the discovery of the challenged evidence has *"become so attenuated as to dissipate the taint"* or when the police learned of the evidence from an independent source <u>Wong Sun</u>, 371 US at 487. That is not the case here. There were no intervening events that serve to purge the taint between the illegal stop and search and the discovery of the cash and lading bill.

Warrantless searches "are per se unreasonable," "subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. Generally, evidence will not be excluded if it was discovered from a source independent of the illegal activity; if its discovery was inevitable; or if there is attenuation between the illegal activity and the discovery of the evidence; or if the police relied in good faith on a subsequently invalidated search warrant. See generally, <u>Nix v. Williams</u>, 467 US 431 (1984). To determine whether to permit the admission of evidence that is the product of official misconduct, the court must considered whether any of three commonly advanced exceptions to the exclusionary rule—the "independent source," "inevitable discovery," or "attenuation" doctrines exist. See <u>Nardone v. United States</u>, 308 U. S. 338, 341 (1939) (attenuation); <u>Silverthorne Lumber Co. v. United States</u>, 251 U. S. 385,

392 (1920) (independent source); <u>United States ex rel. Owens v. Twomey</u>, 508 F. 2d 858, 865 (CA7 1974) (inevitable discovery).

    1)  <u>STOP AND FRISK</u>:

Here, as discussed, the exception to the exclusionary rule highlighted in *Terry* does not apply because the officers did not have articulable facts to warrant a reasonable suspicion of criminality.

    2)  <u>INEVITABLE DISCOVERY</u>:

In *Chapman*, the Court held that the inevitable discovery exception to the exclusionary rule *"serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial."* <u>Chapman v. California</u>, 386 U. S. 18, 22 (1967). However, in this case, the police already searched the shipments and found no evidence of criminality. While the police in New Mexico, may have inevitably discovered the drugs in the shipment there, without the illegal search of the car driven by Mr. Langford in Tucson, the police would not have been able to tie both Defendants to the shipment found there.  This is clear from the lack of any other evidence used to connect the Defendants to the shipment (i.e. fingerprints, video footage, documentation, etc.).

    3)  <u>WARRANTLESS ARREST AND SEARCH INCIDENT TO ARREST</u>:

The police may arrest a suspect without a warrant for a crime committed in the officers presence or when they have probable cause to believe that the individual committed a felony. *"The exception for a search incident to a lawful arrest applies only to "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence."* <u>Arizona v. Gant</u>, 556 U.S. 335, 129 S.Ct. 1713, 173 L.Ed.2d 485 (2009); citing <u>Chimel</u>, 395 U.S., at 763, 89 S.Ct. 2034. Neither exception applies here. As discussed, the police did not have reasonable suspicion or probable cause to believe that either Mr. Langford or Mr. Taylor had committed a criminal offense.

    4)  <u>AUTOMOBILE EXCEPTION</u>:

In <u>Belton</u>, the Court identified what is referred to as the "automobile exception." <u>New York v. Belton</u>, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). There the Court held that the police may search the passenger compartment of a vehicle and any containers therein, as a contemporaneous incident of a recent occupant's lawful arrest. <u>Id</u>. at 460.

The Court justified such a search on the ground that it concerned the scope of a search incident to arrest. Id. Such a search is limited to the articles inside a vehicle's passenger compartment that are within the area which an arrestee might reach. Id. citing Chimel, 395 U. S., at 763.

However, the lawfulness of such a search is predicated on the assumption that the officers conducted a lawful custodial arrest that justifies the infringement of the privacy interests of the arrestee. Id. at 462. "*A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.*" Id. citing Untied v. States Robinson, 414 U. S., at 235. However, even when a statute authorizes the search, the Supreme Court has consistently held that the exclusionary rule requires suppression of evidence obtained during an invalid search, without probable cause and without a valid warrant. Michigan v. DeFillippo, 443 US 31, 39 (1979); citing Torres v. Puerto Rico, 442 U. S. 465 (1979); Almeida-Sanchez v. United States, 413 U. S. 266 (1973); Sibron v. New York, 392 U. S. 40 (1968); Berger v. New York, 388 U. S. 41 (1967). In this case, a lawful arrest did not take place, thus the subsequent search either vehicle cannot be predicated on this exception.

    5)  THE ATTENUATION DOCTRINE:

The attenuation doctrine, permits the admission of evidence that would otherwise be inadmissible, when the connection between unconstitutional police conduct and the evidence is sufficiently remote or has been interrupted by some intervening circumstance. Utah v. Strieff, 136 S. Ct. 2056, 2058 (2016); citing Hudson v. Michigan, 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56. Pp. 2060-2062.

In Brown the Court identified three intervening factors that serve to limit the application of the exclusionary rule. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. "*The temporal proximity of the arrest and the confession, the presence of intervening circumstances.*" Id at 604; citing Johnson v. Louisiana, 406 U. S. 356, 365 (1972), The Court next looks at "*the purpose and flagrancy of the official misconduct*" Id. citing United States v. Edmons, 432 F. 2d 577 (CA2 1970). United States ex rel. Gockley v. Myers, 450 F. 2d 232, 236 (CA3 1971), cert. denied, 404 U. S. 1063 (1972); United States v. Kilgen, 445 F. 2d 287, 289 (CA5 1971). In the context of suppressing an unlawfully obtained statement, the Court looks at the voluntariness of the statement. Id. (discussed

infra in section "D".) In all  such cases, the burden of proving admissibility rests, on the prosecution. <u>Nardone v. United States</u>, 308 U. S. 338, 342 (1939).

Here the "temporal proximity" between the initial illegal stop and the discovery of the currency and lading bill was miniscule, thereby favoring suppression. Likewise, there were no intervening circumstances, between the illegal arrest and the discovery of either the lading bill or the currency that would serve to remove the taint of the illegal search and seizure.

The final factor of the attenuation doctrine examines *"the purpose and flagrancy of the official misconduct".* It is clear from the agent's own admission that Detective Hopkins *"arranged to have the vehicles stopped,"*[3] that the stop was merely pretextual. The fact that the stop was merely a pretext demonstrates its unlawful character. There is no indication that either Mr. Taylor or Mr. Langford violated any traffic laws.  *"The exclusionary rule exists to deter police misconduct."* <u>Utah v. Strieff</u>, 136 S. Ct. 2056, 2063 (2016); citing <u>Davis v. United States</u>, 564 U.S. 229, 236-237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). Here, when the law enforcement officers did not find anything when they search the shipment, they followed the Defendants and arranged a baseless stop, in hopes that they could find any reason to arrest them.

### D.  MR. LANGFORD'S CONSENT TO SEARCH THE VEHICLE WAS INVOLUNTARY.

The Fourth Amendment does not permit law enforcement to conduct routine searches of people or vehicles during traffic stops without suspicion. See  <u>Michigan v. Long</u>, 463 U.S. 1032, 1049 n.14 (1983). ( ( *"We stress that our decision does not mean that the police may conduct automobile searches whenever they conduct an investigative stop . . . ."*). Even when a traffic stop leads to an arrest, the police may not automatically search the stopped vehicle. <u>Gant,</u> 129 S. Ct. 1710, 1723-24 (2009).

A warrantless search is unconstitutional unless the government demonstrates that it *"fall[s] within certain established and well-defined exceptions to the warrant clause."* <u>United States v. Brown</u>, 563 F.3d 410, 414-15 (9th Cir. 2009); citing <u>United States v. Murphy</u>, 516 F.3d 1117, 1120 (9th Cir. 415*415 2008) (quoting <u>United States v. Delgadillo-Velasquez</u>, 856 F.2d 1292, 1298 (9th Cir.1988)). While consent establishes an exception to a warrantless search. <u>Schneckloth</u>, 412 U.S. at 222. The government bears the burden of proving that consent was voluntary. <u>United States v. Patayan Soriano</u>, 361 F.3d 494, 501 (9th Cir. 2004).

---

[3] See DHS REPORT, ABF Surveillance Operation and Seizure of $49,060.00 U.S. Currency, page 3.

(emphasis added). The government must prove that consent *"was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."* Florida v. Royer, 460 U.S. 491, 497 (1983). (emphasis added).

While law enforcement sought Mr. Langford's permission to search the Impala, that consent was not freely given. Whether consent to a search was in fact *"voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances."* Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The circumstances under which the defendant came into custody are relevant to this evaluation.

The voluntariness test recognizes our societies *"deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice."* Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact, determined from all the circumstances. Schneckloth, 412 U.S. at 248-49, 93 S.Ct. 2041. The Court will consider the following factors in determining voluntariness include

> *"(1) the age, education and intelligence of the defendant; (2) whether defendant was advised of his constitutional rights; (3) the length of [any] detention prior to consent; (4) whether defendant consented immediately or police made repeated requests for consent; (5) whether physical coercion was used; [and] (6) whether defendant was in custody."* U.S. v. Biggs, 491 F.3d 616, 621 (7th Cir.2007).

The courts will also consider factors such as the number of officers present and the show of force they made, as well as whether the officers were visibly armed. United States v. Groves, 470 F.3d 311, 322 (7th Cir.2006). The government has the burden of proving voluntariness by a preponderance of the evidence. Schneckloth, 412 U.S. at 222; Groves, 470 F.3d at 322. *"Under the Fourth Amendment, however, evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding the suspect's consent, unless subsequent events have purged the taint."* Chavez-Valenzuela, 268 at 727; citing Royer, 460 U.S. at 507-08, 103 S.Ct. 1319; Wong Sun, 371 U.S. at 491; United States v. Morales, 972 F.2d 1007, 1010 (9th Cir.1992).

*"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."* United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). The voluntariness of the consent to search must be viewed in the totality of the

circumstances. Schneckloth, 412 U.S. at 227. A court must consider several factors, including whether "*the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found.*" United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002).

A seizure occurs when, "*a reasonable person would have believed that he or she was not free to leave.*" Jones v. Cnty. of Los Angeles, 802 F.3d 990, 1000-01 (9th Cir. 2015) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "*The Ninth Circuit has identified five [non-exclusive] factors that aid in determining whether a person's liberty has been so restrained.*" United States v. Brown, 563 F.3d 410, 415 (9th Cir. 2009). These include: "(1) the number of officers present, (2) whether weapons were displayed, (3) whether the encounter occurred in a public or non-public setting, (4) whether the officer's authoritative manner would imply that compliance would be compelled, and (5) whether the officers advised the detainee of his right to terminate the encounter. Id. See also Schneckloth, 412 U.S. at 227.

Here it was clear that neither, Mr. Langford's s consent to search the car nor his subsequent statements were made voluntarily. Mr. Langford was forty (40) years-old when he was arrested. However, when agents approached him and asked to search his vehicle, he consented because he did not know that he had a choice.  Law enforcement officers made a huge show of force and approached Mr. Langford while he innocently pulled into a gas station parking lot.

A person is in custody if he reasonably believes he is not free to leave or is otherwise deprived of his freedom in a significant way. See generally, Miranda v. Arizona, 384 U.S. 436, at 444 (1966). To determine whether an individual was in custody, the court will consider whether there was "*a restraint on freedom of movement of the degree associated with a formal arrest.*" Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). This is an objective test. Id. Whether a person in the defendant's circumstances would feel that he was free to leave. The Court summarized the underlying spirit of this analysis "*[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.*" Berkemer v. McCarty, 468 U.S. 420, 442 (1984). A reasonable

person confronted with the same show of interagency-force would not have believed he had the right to refuse consent to the search.

Mr. Langford's history of arrest and incarceration planted in his mind the mistaken belief that all interactions with law enforcement are involuntary. Moreover, this investigation involved agents from Homeland Security Investigations, Tucson Border Enforcement Security Taskforce, and Arizona Department of Public Safety. Such a display of force and authority would render a reasonable person to believe that when he was approached by agents, the interaction was involuntary.

### E.  MR. LANGFORD'S STATEMENT SHOULD BE SUPPRESSED BECAUSE IT WAS THE PRODUCT OF AN ILLEGAL STOP AND DELAYED MIRANDA WARNINGS.

Mr. Langford was stopped while he parked his car at a gas station. Law enforcement officers had no basis to question him. There was no reasonable suspicion that he had broken the law. While law enforcement officers did eventually read him his *Miranda rights,* they had no basis to question him in the first place. It is only after the police made the illegal stop of the U-Haul and searched it, that they had reason to take Mr. Langford into custody. However, law enforcement officers began questioning Mr. Langford while he sat in the parking lot of the Shell Gas Station. (Throughout the video of his interrogation, police refer back to statements he made during the "traffic stop." [4])

Generally, law enforcement does not violate the Fourth Amendment *"by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen."* Florida v. Royer, 460 U. S. 491, 497 (1983); citing Dunaway v. New York, 442 U. S. 210 n. 12 (1979); Terry v. Ohio, 392 U. S., at 31, 32-33 (Harlan, J., concurring). It is also true that a statement made by a defendant during an unlawful detention may be admissible if the statement is *"... sufficiently an act of free will to purge the primary taint of the unlawful invasion."* Wong Sun 371 U.S. at 486.

The relevant inquiry is whether the *"statements were obtained by exploitation of the illegality of the arrest."* Brown v. Illinois, 422 U.S. 590, 600, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975). Courts will often look toward the voluntariness of the statement. See generally, Johnson v. New Jersey, 384 US 719 (1966).

---

[4] See for example: Video recording of police interview 0:57 -1:05 minutes; 14:31-15:00 minutes.

1) <u>MR. LANGFORD WAS QUESTIONED WITHOUT BEING READ HIS MIRANDA RIGHTS OUTSIDE THE INTERROGATION ROOM.</u>

Once Mr. Langford was taken into an interrogation room, the law enforcement officers (Hopkins and Valenzuela) start the interview by reading him his Miranda rights. The interrogator stated, *"Right now you're under arrest, you're just being detained for what we found for this investigation."* (See video recording of police interview 0:00 -1 minute). All the while, they had already obtained all the information they wanted from Mr. Langford. At minute 14:29 of the video recording of police interview, when a third officer (Ofc. Huerta) enters the interrogation room, one of the other officers can be heard saying *"SO BASICALLY HE ALREADY TOLD US WHAT HE TOLD YOU...."* referring to Mr. Langford's statements during the "traffic stop." (emphasis added.) The interrogating officer then summarized the information the police received from Mr. Langford.

Because the law enforcement officers had already elicited incriminating information from Mr. Langford prior to reading him his rights, the ceremonial exercise of reciting them in the interrogation room was rendered constitutionally useless. The on-camera performance was shrewdly calculated to serve as a preemptory rebuttal to any future allegation of police misconduct.  When this Court views the video it will clearly show that the reading of Mr. Langford's Miranda Warnings was a sham and was done only to make it appear to comply with the law.

2) <u>LAW ENFORCEMENT OFFICERS VIOLATED MR. LANGFORD'S 5th and 6th AMENDMENT RIGHTS BY QUESTIONING WITHOUT FIRST ADVISING HIM OF HIS "MIRANDA RIGHTS," AS SUCH HIS STATEMENTS AND RELATED EVIDENCE MUST BE SUPPRESSED.</u>

Law enforcement officers intentionally elicited incriminating information without first advising Mr. Langford of his rights, as required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and its progeny. Statements taken without sufficient Miranda warnings are presumed to have been coerced when necessary to protect the privilege against self-incrimination. <u>Patane</u>, 542 at 644. As a precursor to <u>Miranda</u>, Justice Harlan stated in his dissenting opinion in <u>Mapp v. Ohio</u>:

> Without the protections flowing from adequate warnings and the rights of counsel, *"all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police."* <u>Mapp v. Ohio</u>, 367 U. S. 643, 685 (1961)

In <u>Miranda</u> the Supreme Court affirmed this axiom when it ruled that *"[T]he need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires."* 384 U.S. at 470. While the Court will not always exclude statements made during an illegal arrest, for instance when there exist intervening factors, rendering the accused's eventual statement *"the product of his own reflection and free will"* <u>Brown</u> at 422 US at 610.

In assessing whether an individual was in custody for purposes of *Miranda*, the Court considers *"the objective circumstances surrounding the interrogation to determine whether a reasonable person would have felt free to stop the questioning and leave."* <u>Howes v. Fields</u>, 132 S.Ct. 1181, 1189 (2012). Custodial interrogations *"isolates and pressures the individual... [e]ven without employing brutality, the `third degree' or [other] specific stratagems, . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."* <u>Miranda</u> at 455. Coercion is inherent in custodial interrogations, it blurs the lines between voluntary and involuntary statements, such that there is a heightened risk that an individual will not be *"accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself."* <u>Dickerson v. United States</u>, 530 US 428, 435 (2000) citing <u>Id</u>., at 439. (emphasis added).

The Supreme Court held, *"interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police, that the police should know are reasonably likely to elicit an incriminating response from the suspect."* <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Whether a statement was made "voluntary" or was the product of duress or coercion, is determined from the totality of the circumstances. <u>Schneckloth</u>, 412 at 227. The courts will look at the circumstances under which the defendant came into custody, whether he was aware of his right to withhold consent, the defendant's level of cooperation, his age, intelligence, and education, and the police's behavior. *Project: Criminal Procedure*, 74 Geo.L.J. 550-51 (1986). In <u>Bram</u> the Supreme Court held:

> "In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by

them. But a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." <u>Bram v. United States</u>, 168 U. S. 532." 266 U. S., at 14-15.

Not only did the agents fail to read Mr. Langford his Miranda Rights, once they had already questioned him, law enforcement officers acted out a farcical recitation of the warnings before the cameras, to secure a conviction. As the Supreme Court stated, the Courts *"…the strongly felt attitude… that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."* <u>Blackburn v. Alabama</u>, 361 U. S. 199, 206-207.

Two Supreme Court decisions addressed delayed Miranda warnings, administered after the police had already begun interrogation of the defendant; <u>Oregon v. Elstad</u>, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and <u>Missouri v. Seibert</u>, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In <u>Elstad</u>, the Supreme Court concluded that even when a suspect in custody answers the police's *"unwarned questions,"* those statements may be deemed admissible if, the suspect is deemed to have voluntarily waived his rights. <u>Elstad</u>, 470 U.S. at 314, 105 S.Ct. at 1296. *"[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."* <u>Id.</u>

In that case, a witness to a burglary contacted the police and told them that Michael Elstad, an eighteen-year old male, had committed the burglary. <u>Id</u>. at 300, 105 S.Ct. at 1288. Officers arrived at his home and when questioned, Elstad made an incriminating statements. <u>Id</u>. Once they transported him to the police station, police was advised Elstad of his *Miranda* rights. Elstad then voluntarily executed a written confession. <u>Id</u>. at 302. The Supreme Court ruled that the Elstad's pre-warning statements were properly excluded, as they were obtained in violation of *Miranda*. <u>Id</u>. at 302, 105 S.Ct. at 1289. However, the Court concluded that despite the officers' initial failure to read Elstad his *Miranda* warnings, his post-warning confession remained admissible. <u>Id</u>. at 308, 105 S.Ct. at 1293. The Court reasoned that *"[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities."* <u>Id</u>. at 308, 105 S.Ct. at 1293.

Elstad is markedly different from the case at hand. There a witness to a burglary contacted the police and informed them of the perpetrators identity. <u>Id</u> at 301. The police arrived at his home armed with an arrest warrant. <u>Id</u>. Once there, his mother answered the

door and led officers into the house. Id. While one officer spoke with Elstad's mother in the kitchen, the other officer directly questioned him in the living room without giving him any Miranda warnings. Id. Even with those facts, the State conceded that Elstad was "in custody" and his pre-Miranda statement, where he told officers *"I was there,"* as he sat in the comfort of his own living room. Id. at 303.

Here, the police did not have a warrant to arrest Mr. Langford. They did not have probable cause to believe he had committed a crime when they arrested him. In fact, at that point in time all they had was a "suspicion" founded on a call from a shipping company.  And most importantly, they did not have reasonable suspicion to approach him and begin their interrogation, and thereafter search his vehicle as he parked at the Shell gas station. Just as they feigned the traffic stop of the U-Haul, the police staged a counterfeit *Miranda* bolster the myth that Mr. Langford was advised of his rights prior to questioning.

In Elstad the Supreme Court ultimately held that, while *Miranda* requires suppression of any unwarned admissions *"the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."* Id. at 309, 105 S.Ct. at 1293. Much more akin to the facts of this case, is the Supreme Court's decision in *Seibert*, where the Court addressed the narrow questions of; whether the ruling rule in Elstad applies when police officers make the deliberate decision to withhold her Miranda warnings? Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

In that case, Seibert was convicted of second degree murder. Seibert, 542 U.S. at 604. When Seibert's 12-year-old son, who had cerebral palsy, died in his sleep, her teenaged sons feared that she would be charged with neglect due to the bedsores on his body. Id. Along with and their two friends, Siebert's sons concocted a plan conceal the cause of death by incinerating the body in the family's mobile home. Id. The boys planned to leave Donald Rector, a mentally ill teenager living with the family, in the home to avoid any appearance that Jonathan had been unattended. Seibert, 542 U.S. at 604. Donald died when Seibert's son set the fire to the mobile home. Id. These plans were apparently made in Siebert's presence. Id.

Several days after the fire, Seibert was interrogated by a police officer at the hospital. Id. at 605. The officer initially withheld her *Miranda* warnings, hoping to get a confession from her first. Id. He questioned Siebert for 40 minutes as he squeezed her arm and repeated *"Donald was also to die in his sleep."* Id. Once he had secured her confession, the officer

momentarily stopped his questioning and advised Siebert of her Miranda rights. Id.  The officer resumed questioning her after she waived those rights, prompting her to restate the confession she had made earlier. Id.

In reviewing the case, the Supreme Court in a 5-4 decision held that the police "technique" of interviewing suspects and obtaining a confession then subsequently issuing *Miranda* warnings, does not satisfy Miranda's purpose. Seibert, 542 U.S. at 612. The Court stated:

> "For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." Seibert, 542 U.S. at 612.

Justice Souter drafted the plurality opinion of the Court.  Seibert, 542 U.S. 600. The Court held that a secondary confession is admissible only if; the intermediate Miranda warnings were *"effective enough to accomplish their object."* Id. at 622. The plurality focused on the actual effectiveness of *Miranda* warnings given following a prior unwarned confession. Id. Merely giving the warnings is not necessarily good enough. The Court wrote, citied its earlier decision in *Prysock*, *"Just as 'no talismanic incantation [is] required to satisfy [Miranda's] strictures' it would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance.* Id. at 612, citing California v. Prysock, 453 U. S. 355, 359 (1981) (per curiam) (emphasis added).  Instead, the threshold issue before a court is, *"Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?"* Id.

The Plurality provided some guidance as to when an intermediate warning might be considered effective. It set forth a multifactor test for determining the admissibility of a second confession. Seibert, 542 U.S. at 614-615. An intermediate warning is likely to mislead a defendant about his rights when it is made *"in the midst of coordinated and continuing interrogation."* Id. Thus, the courts should consider:

> "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 614 (emphasis added).

Here, it is clear from context, that Mr. Langford gave nearly identical statements to police. At minute 14:29 of the video recording (conducted by Hopkins and Valenzuela), when a third officer (HSI SAI Huerta) enters the room, the interrogating officers tells him, *"SO BASICALLY HE ALREADY TOLD US WHAT HE TOLD YOU…."* SAI Huerta then effortlessly takes over the interrogation and says *"What did I tell you when I was doing the traffic stop, I've been doing this for a while right?"* at minute 14:45.

Mr. Langford was in continuous police custody throughout the interaction. Moreover, the timing between the two interrogations was not sufficient enough to dissipate taint of the unwarned confession. According to police reports, the Defendants left the ABF storage facility at about 10:35 a.m. They then travelled to the U-Haul facility where Mr. Langford exited to the truck and drove off in an Impala. Shortly thereafter, the police stopped the U-Haul and approached Mr. Langford at the gas station. From that point forward the police conducted a search of both the Impala and the U-Haul and the interrogation of both Defendants. The time stamp on the video interrogation is 1:56 p.m. The degree of continuity between the first interrogation and the second is seamless. When Officer Huerta, who conducted the unwarned interrogation enters the room, is informed that Mr. Langford relayed the same information to during the second interrogation. Without hesitation, he continues questioning Langford as part of a continuous interrogation.

Justice Kennedy, who provided the fifth vote for the majority, wrote in his concurring opinion that: the second confession should be inadmissible only if when evaluating the warning and subsequent break in questioning,  the court finds that *"the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."* <u>Seibert</u>, 542 U.S. at 622. In his view, if the court finds that the police acted deliberately, the post-warning statements must be excluded unless curative measures are taken before they were made. <u>Id</u>. Even under this standard, the statements made by Mr. Langford must be excluded. It is clear as discussed above, that the police acted intentionally and deliberately to coerce confessions out of the Defendant, only to then cover up their misdeeds with a videotaped performance.

## III. <u>CONCLUSION:</u>

The facts of this case center around two flagrant fabrication. 1) The police concocted a non-existing "traffic violation" as a pretext through which they could claim "reasonable

suspicion" to pull over the U-Haul; 2) the police spuriously pretended to administer an impostorous pre-interrogation *Miranda* warnings, to convince subsequent observers that Mr. Langford was advised of his rights prior to questioning. Our notions of justice cannot permit the purposeful desecration of the suspects rights under the Constitution, by turning a blind eye to fabrication and later cover-up of police transgressions.

**RESPECTFULLY SUBMITTED** this 2nd day of October, 2019.

**LAW OFFICES OF THOMAS E. HIGGINS, P.L.L.C**

*/S/ Thomas E. Higgins*
THOMAS E. HIGGINS
Attorney for Rodney Langford

A copy of the foregoing
mailed/delivered to the following
this 2nd day of October, 2019, to:

Hon. Raner C. Collins

Michael Bailey
United States Attorney
District of Arizona
Jackson A. Stephens
Liza Granoff
Assistant U.S. Attorneys
405 W Congress St, Fourth Floor
Tucson, AZ 85701